# Exhibit A

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "Agreement") is entered into as of March 19, 1999, by and between ICON Group Limited, Cayman Islands corporation (the "Seller"), and the several purchasers listed on Exhibit A hereto (each a "Purchaser" and together the "Purchasers").

## RECITALS

WHEREAS, the Seller owns four million seven hundred fifty thousand (4,750,000) shares of Common Stock of Digital Reflection, Inc., a Nevada corporation (the "Company"), and desires to sell one hundred eight thousand (108,000) of these shares;

WHEREAS, each Purchaser desires to purchase severally and not jointly and the Seller desires to sell to each Purchaser that number of shares of Common Stock set forth opposite each such Purchaser's name on Exhibit A attached hereto on the terms and conditions set forth herein. The shares of Common Stock of the Company sold to Purchasers pursuant to this Agreement shall be hereinafter referred to as the "Shares."

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises hereinafter set forth, the parties hereto agree as follows:

1.  AGREEMENT TO SELL AND PURCHASE.

    1.1  **Sale and Purchase.** Subject to the terms and conditions hereof, at the Closing (as hereinafter defined) the Seller hereby agrees to sell to each Purchaser, and each Purchaser agrees to purchase severally and not jointly from the Seller, that number of Shares opposite each such Purchaser's name on Exhibit A attached hereto at a purchase price of two dollars and fifty cents ($2.50) per Share, for an aggregate purchase price of two hundred and seventy thousand dollars ($270,000.00).

2.  CLOSING, DELIVERY AND PAYMENT.

    2.1  **Closing.** The closing of the sale and purchase of the Shares under this Agreement (the "Closing") shall take place at 10:00 a.m. on the date hereof, at the offices of Cooley Godward LLP, 5 Palo Alto Square, 3000 El Camino Real, Palo Alto, CA 94306 or at such other time or place as the Seller and Purchasers may collectively agree (such date is hereinafter referred to as the "Closing Date").

    2.2  **Delivery.** At the Closing, subject to the terms and conditions hereof, the Seller will deliver to each Purchaser a certificate representing the number of Shares to be purchased at the Closing by such Purchaser, against payment of the purchase price therefor by check or wire transfer made payable to the order of the Seller.

3.  **REPRESENTATIONS AND WARRANTIES OF THE SELLER.**

The Seller hereby represents and warrants to the Purchaser as of the date of this Agreement as follows:

**3.1  Title to Shares.**  Seller is the owner, beneficially and of record, of the Shares, free and clear of any liens, encumbrances, security agreements, equities, options, claims, charges or restrictions and effective with the Closing, Seller's entire right, title and interest in and to the Shares shall have been conveyed to the Purchasers.

**3.2  No Encumbrances.**  When sold in compliance with the provisions of this Agreement, the Shares will be free of any liens or encumbrances, *provided, however*, that the Shares may be subject to restrictions on transfer under state and/or federal securities laws as set forth herein or as otherwise required by such laws at the time a transfer is proposed.

**3.3  Authorization; Binding Obligations.**  The Seller has all requisite corporate power and authority to execute and deliver this Agreement, to sell the Shares and to carry out the provisions of this Agreement.  The Agreement when executed and delivered, will be a valid and binding obligation of the Seller enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (b) general principles of equity that restrict the availability of equitable remedies.  The sale of the Shares is not and will not be subject to any preemptive rights or rights of first refusal that have not been properly waived or complied with.

4.  **REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.**

Each Purchaser hereby severally and not jointly represents and warrants to the Seller as follows:

**4.1  Requisite Power and Authority.**  Purchaser has all necessary power and authority under all applicable provisions of law to execute and deliver this Agreement and to carry out its provisions.  All action on Purchaser's part required for the lawful execution and delivery of this Agreement has been or will be effectively taken prior to the Closing.  Upon execution and delivery, this Agreement will be a valid and binding obligation of the Purchaser, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (b) general principles of equity that restrict the availability of equitable remedies.

**4.2  Investment Representations.**  Purchaser understands that the Shares have not been registered under the Securities Act.  Purchaser also understands that the Shares are being offered and sold pursuant to an exemption from registration contained in the Securities Act based in part upon Purchaser's representations contained in the Agreement.  Purchaser hereby represents and warrants as follows:

(a) **Purchaser Bears Economic Risk.** Purchaser has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company so that it is capable of evaluating the merits and risks of its investment in the Company and has the capacity to protect its own interests. Purchaser must bear the economic risk of this investment indefinitely, unless the Shares are registered pursuant to the Securities Act, or an exemption from registration is available. Purchaser understands that the Company has no present intention of registering the Shares or any shares of its Common Stock. Purchaser also understands that there is no assurance that any exemption from registration under the Securities Act will be available and that, even if available, such exemption may not allow Purchaser to transfer all or any portion of the Shares under the circumstances, in the amounts or at the times Purchaser might propose.

(b) **Acquisition for Own Account.** Purchaser is acquiring the Shares for Purchaser's own account for investment only, and not with a view towards their distribution.

(c) **Purchaser Can Protect Its Interest.** Purchaser represents that by reason of its business or financial experience, Purchaser has the capacity to protect its own interests in connection with the transactions contemplated in this Agreement. Further, Purchaser is aware of no publication of any advertisement in connection with the transactions contemplated in this Agreement.

(d) **Company Information.** Purchaser is familiar with the Company's business, management, financial affairs, operations and facilities.

(e) **Accredited Investor.** Purchaser represents that it is an accredited investor within the meaning of Regulation D under the Securities Act.

(f) **Rule 144.** Purchaser acknowledges and agrees that the Shares must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser has been advised or is aware of the provisions of Rule 144 promulgated under the Securities Act as in effect from time to time, which permits limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including, among other things: the availability of certain current public information about the Company, the resale occurring following the required holding period under Rule 144, and the number of shares being sold during any three-month period not exceeding specified limitations.

(g) **Residence.** The office or offices of the Purchaser in which its investment decision was made is located at the address or addresses of the Purchaser set forth on the signature page hereto.

4.3 **Transfer Restrictions.** Purchaser acknowledges and agrees that the Shares are subject to restrictions on transfer including a right of first-refusal in favor of the Company as set forth in the Founder Stock Purchase Agreement dated August 30, 1997 by and between Seller and the Company (the "Founder Agreement"), a copy of which is attached hereto as <u>Exhibit B</u> and incorporated herein by this reference.

36248 v2/PM
ryw02!.DOC
060799/1510

5.  CONDITIONS TO CLOSING.

   5.1   **Conditions to Purchaser's Obligation at the Closing.** Purchaser's obligation to purchase the Shares at the Closing are subject to the satisfaction, at or prior to the Closing Date, of the following conditions:

        (a)   **Representations and Warranties True; Performance of Obligations.** The representations and warranties made by the Seller in Section 3 hereof shall be true and correct as of the Closing Date with the same force and effect as if they had been made as of the Closing Date, and the Seller shall have performed all obligations and conditions herein required to be performed or observed by it on or prior to the Closing.

        (b)   **Consents, Permits, and Waivers.** The Seller shall have obtained any and all consents, permits and waivers necessary or appropriate for consummation of the transactions contemplated by the Agreement (except for such as may be properly obtained subsequent to the Closing).

   5.2   **Conditions to Obligations of the Seller.** The Seller's obligation to issue and sell the Shares at each Closing is subject to the satisfaction, on or prior to such Closing, of the following conditions:

        (a)   **Representations and Warranties True.** The representations and warranties in Section 4 made by the Purchaser shall be true and correct at the date of the Closing, with the same force and effect as if they had been made on and as of said date.

        (b)   **Performance of Obligations.** Purchaser shall have performed and complied with all agreements and conditions herein required to be performed or complied with by Purchaser on or before the Closing.

        (c)   **Consents, Permits, and Waivers.** The Seller shall have obtained any and all consents, permits and waivers necessary or appropriate for consummation of the transactions contemplated by the Agreement (except for such as may be properly obtained subsequent to the Closing).

6.  MISCELLANEOUS.

   6.1   **Governing Law.** This Agreement shall be governed in all respects by the laws of the State of California such laws are applied to agreements between California residents entered into and performed entirely in California.

   6.2   **Successors and Assigns.** Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto and shall inure to the benefit of and be enforceable by each person who shall be a holder of the Shares from time to time.

6.3    **Entire Agreement.** This Agreement and Exhibits hereto, the Founder Agreement and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein and therein.

6.4    **Severability.** In case any provision of the Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

6.5    **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Seller at the address as set forth on the signature page hereof and to Purchaser at the address set forth on signature page hereof or at such other address as the Seller or Purchaser may designate by ten (10) days advance written notice to the other parties hereto.

6.6    **Titles and Subtitles.** The titles of the sections and subsections of the Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

6.7    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

6.8    **Broker's Fees.** Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this Section 6.8 being untrue.

6.9    **THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION OR IN THE ABSENCE OF AN EXEMPTION FROM SUCH QUALIFICATION IS UNLAWFUL. PRIOR TO ACCEPTANCE OF SUCH CONSIDERATION BY THE SELLER, THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION FROM SUCH QUALIFICATION BEING AVAILABLE.**

IN WITNESS WHEREOF, the parties hereto have executed the STOCK PURCHASE AGREEMENT as of the date set forth in the first paragraph hereof.

SELLER:

ICON GROUP LIMITED

By: _____

Print Name: INGEMAR JANSSON

Title: Chairman

c/o Digital Reflection, Inc.
536 N. Santa Cruz Avenue
Los Gatos, CA 95030

PURCHASER:

ROBERT P. SCHIRO SENIOR TRUST

By: _____

Print Name: Robert P. Schiro Sr.

Title: Trustee Robert P. Schiro Trust

Address: 5155 Stevens Creek
Santa Clara 95051
Calif.

# EXHIBIT A

## SCHEDULE OF PURCHASERS

| NAME | NUMBER OF SHARES | PURCHASE PRICE |
|------|------------------|----------------|
| Robert P. Schiro Senior Trust | 99,000 | $247,500 |
| David Walker | 1,000 | $2,500 |
| Joseph R. Kafka and Deborah Siebrandt | 6,000 | $15,000 |
| Demetrios Barrous | 2,000 | $5,000 |
| TOTAL: | 108,000 | $270,000 |

# EXHIBIT B

## FOUNDER STOCK PURCHASE AGREEMENT

04-05546    Doc# 7-1    Filed: 02/01/05    Entered: 02/01/05 11:12:29    Page 9 of
25

# DIGITAL REFLECTION, INC.

## FOUNDER STOCK PURCHASE AGREEMENT

THIS FOUNDER STOCK PURCHASE AGREEMENT (the "Agreement") is made as of the 30th day of August, 1997, by and between Digital Reflection, Inc., a Nevada corporation (the "Company"), and Icon Group Limited, a Cayman Islands corporation ("Purchaser").

WHEREAS, pursuant to Section 78.200 of the Nevada General Corporation Law, the Company desires to issue, and Purchaser desires to acquire, stock of the Company as herein described, on the terms and conditions hereinafter set forth;

WHEREAS, the issuance of common stock hereby is in connection with a compensatory benefit plan for the employees, directors, officers, advisers or consultants of the Company and is intended to comply with the provisions of Rule 701 promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Act").

NOW, THEREFORE, IT IS AGREED between the parties as follows:

1. **PURCHASE AND SALE OF STOCK.** Purchaser hereby agrees to purchase from the Company, and the Company hereby agrees to sell to Purchaser, an aggregate of Four Million Seven Hundred Fifty Thousand (4,750,000) shares of the Common Stock of the Company (the "Stock") at $0.001053 per share, for an aggregate purchase price of $5,001.75, payable as follows:

Cash.................................................................................................................$5,001.75

The closing hereunder, including payment for and delivery of the Stock shall occur at the offices of the Company immediately following the execution of this Agreement, or at such other time and place as the parties may mutually agree.

2. **RIGHT OF FIRST REFUSAL.** Before any Stock registered in the name of Purchaser may be sold or transferred (including transfer by operation of law) other than as set forth in Section 2(f) below, such shares shall first be offered to the Company, which will have the right to purchase all or any part of the Stock proposed to be transferred ("Right of First Refusal"), in the following manner:

(a) Purchaser or his or her legal representative shall first give written notice (the "Transfer Notice") of any proposed transfer to the Company. The Transfer Notice shall name the proposed transferee, state the number of shares of Stock to be transferred, and if the transfer is voluntary, the price per share and all other terms of the offer. The Transfer Notice shall be signed by Purchaser or his or her representative and the prospective transferee and must constitute a binding agreement for the transfer of the Stock subject only to the Right of First Refusal.

Case: 04-05546    Doc# 7-1    Filed: 02/01/05    Entered: 02/01/05 11:12:29    Page 10 of
25

**(b)** Within thirty (30) days of delivery of Purchaser's notice of a proposed voluntary transfer, the Company's Board of Directors shall determine the bona fide nature of the proposed voluntary transfer and give Purchaser written notice of its determination. If the proposed transfer is deemed to be bona fide, the remaining subsections of this section shall apply to the sale. If the proposed transfer is deemed not to be bona fide, Purchaser will be responsible for providing additional information to the Board of Directors of the Company to show the bona fide nature of the proposed transfer and no Stock will be transferred on the books of the Company until the Board of Directors of the Company has approved the proposed transfer as bona fide.

**(c)** If the Company fails to exercise in full the Right of First Refusal within thirty (30) days from the later of the date the Transfer Notice is delivered to the Company or thirty (30) days after the date the transfer is determined to be bona fide (if Purchaser is required to provide additional information as provided in Section 2(b) above), Purchaser may, not later than one hundred twenty (120) days following delivery to the Company of the Transfer Notice, conclude a transfer of the shares of Stock subject to the Transfer Notice which have not been purchased by the Company pursuant to exercise of the Right of First Refusal on the terms and conditions described in the Transfer Notice. Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by Purchaser, shall again be subject to the Right of First Refusal and shall require compliance by Purchaser with the procedure described in this Section 2. If the Company exercises the Right of First Refusal, the parties shall consummate the sale of shares of Stock on the terms set forth in the Transfer Notice by the later of sixty (60) days after the delivery of the Transfer Notice to the Company or thirty (30) days after the date the transfer is determined to be bona fide (if Purchaser is required to provide additional information as provided in Section 2(b) above); provided, however, in the event the Transfer Notice provides for the payment for the shares of Stock other than in cash, the Company shall have the option of paying for the shares of Stock by the discounted cash equivalent of the consideration described in the Transfer Notice as reasonably determined by the Company.

**(d)** All transferees of shares of Stock or any interest therein other than the Company shall be required as a condition of such transfer to agree in writing (in a form satisfactory to the Company) that they will receive and hold such shares of Stock or interests subject to the provisions of this Agreement, including the Right of First Refusal.

**(e)** The Right of First Refusal shall terminate at such time as a public market exists for the Company's Common Stock (or any other stock issued by the Company, or any successor, in exchange for the Stock). For the purpose of this Agreement, a "public market" shall be deemed to exist if (i) such stock is listed on a national securities exchange (as that term is used in the Securities Exchange Act of 1934) or (ii) such stock is traded on the over-the-counter market and prices therefore are published daily on business days in a recognized financial journal.

**(f)** The Right of First Refusal shall not apply to any transfer to Purchaser's ancestors or descendants or spouse or to a trustee for their benefit, provided that in any case any

Case: 04-05546    Doc# 7-1    Filed: 02/01/05    Entered: 02/01/05 11:12:29    Page 11 of
25

such transferee shall agree with the Company in writing (in a form satisfactory to the Company) to take the Stock subject to all the terms of this Agreement, including the Right of First Refusal.

      3.     **ESCROW OF STOCK.** As security for Purchaser's faithful performance of the terms of this Agreement and to insure the availability for delivery of Purchaser's Stock upon exercise of the Right of First Refusal, Purchaser agrees, at the closing hereunder, to deliver to and deposit with the Secretary of the Company or the Secretary's designee ("Escrow Agent"), as Escrow Agent in this transaction, three (3) stock assignments duly endorsed (with date and number of shares blank) in the form attached hereto as **Exhibit B**, together with a certificate or certificates evidencing all of the Stock; said documents are to be held by the Escrow Agent and delivered by said Escrow Agent pursuant to the Joint Escrow Instructions of the Company and Purchaser set forth in **Exhibit C** attached hereto and incorporated by this reference, which instructions shall also be delivered to the Escrow Agent at the closing hereunder.

      4.     **RIGHTS OF PURCHASER.** Subject to the provisions of Sections 2 and 3 herein, Purchaser shall exercise all rights and privileges of a stockholder of the Company with respect to the Stock.

      5.     **LIMITATIONS ON TRANSFER.** Purchaser shall not assign, hypothecate, donate, encumber or otherwise dispose of any interest in the Stock except in compliance with the provisions herein and applicable securities laws. Furthermore, the Stock shall be subject to any right of first refusal in favor of the Company or its assignees that may be contained in the Company's Bylaws.

      6.     **RESTRICTIVE LEGENDS.** All certificates representing the Stock shall have endorsed thereon legends in substantially the following forms (in addition to any other legend which may be required by other agreements between the parties hereto):

      **(a)**    "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

      **(b)**    "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY AND/OR ITS ASSIGNEE(S) AS PROVIDED IN THE FOUNDER STOCK PURCHASE AGREEMENT BY AND BETWEEN THE COMPANY AND THE PURCHASER."

      **(c)**    Any legend required by appropriate blue sky officials.

      7.     **INVESTMENT REPRESENTATIONS.** In connection with the purchase of the Stock, Purchaser represents to the Company the following:

Case: 04-05546   Doc# 7-1   Filed: 02/01/05   Entered: 02/01/05 11:12:29   Page 12 of 25

**(a)** Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Stock. Purchaser is purchasing the Stock for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Act.

**(b)** Purchaser understands that the Stock has not been registered under the Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

**(c)** Purchaser further acknowledges and understands that the Stock must be held indefinitely unless the Stock is subsequently registered under the Act or an exemption from such registration is available. Purchaser understands that the certificate evidencing the Stock will be imprinted with a legend which prohibits the transfer of the Stock unless the Stock is registered or such registration is not required in the opinion of counsel for the Company.

**(d)** Purchaser is familiar with the provisions of Rules 144 and 701, under the Act, as in effect from time to time, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of issuance of the securities, such issuance will be exempt from registration under the Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the securities exempt under Rule 701 may be sold by Purchaser ninety (90) days thereafter, subject to the satisfaction of certain of the conditions specified by Rule 144 and the market stand-off provision described in Section 8 below.

In the event that the sale of the Stock does not qualify under Rule 701 at the time of purchase, then the Stock may be resold by Purchaser in certain limited circumstances subject to the provisions of Rule 144, which requires, among other things: (i) the availability of certain public information about the Company and (ii) the resale occurring following the required holding period under Rule 144 after the Purchaser has purchased, and made full payment of (within the meaning of Rule 144), the securities to be sold.

**(e)** Purchaser further understands that at the time Purchaser wishes to sell the Stock there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public current information requirements of Rule 144 or 701, and that, in such event, Purchaser would be precluded from selling the Stock under Rule 144 or 701 even if the minimum holding period requirement had been satisfied.

**(f)** Purchaser further warrants and represents that Purchaser has either (i) preexisting personal or business relationships, with the Company or any of its officers, directors or controlling persons, or (ii) the capacity to protect his own interests in connection with the purchase of the Stock by virtue of the business or financial expertise of himself or of

Case: 04-05546   Doc# 7-1   Filed: 02/01/05   Entered: 02/01/05 11:12:29   Page 13 of
25

professional advisors to Purchaser who are unaffiliated with and who are not compensated by the Company or any of its affiliates, directly or indirectly.

     8.    **MARKET STAND-OFF AGREEMENT.** Purchaser shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, any Common Stock of the Company held by Purchaser, including the Stock (the "Restricted Securities"), for a period of time specified by the underwriter(s) (not to exceed one hundred eighty (180) days) following the effective date of the initial registration statement of the Company filed under the Act. Purchaser agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the underwriter(s) which are consistent with the foregoing or which are necessary to give further effect thereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to Purchaser's Restricted Securities until the end of such period.

     9.    **REFUSAL TO TRANSFER.** The Company shall not be required (a) to transfer on its books any shares of Stock of the Company which shall have been transferred in violation of any of the provisions set forth in this Agreement or (b) to treat as owner of such shares or to accord the right to vote as such owner or to pay dividends to any transferee to whom such shares shall have been so transferred.

     10.    **NO EMPLOYMENT RIGHTS.** As a condition to the sale and purchase of the Stock pursuant to this Agreement, Purchaser agrees to execute an Employee Proprietary Information and Inventions Agreement in the form attached hereto as **Exhibit A**. Notwithstanding Purchaser's agreement to execute such agreement, this Agreement is not an employment contract and nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company (or a parent or subsidiary of the Company) to terminate Purchaser's employment for any reason at any time, with or without cause and with or without notice.

     11.    **MISCELLANEOUS.**

        **(a)**    **Notices.** Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or upon confirmed delivery by telegram or fax or five (5) days following deposit in the United States mail, by registered or certified mail with postage and fees prepaid, addressed to the other party hereto at his address hereinafter shown below its signature or at such other address as such party may designate by ten (10) days' advance written notice to the other party hereto.

        **(b)**    **Successors and Assigns.** This Agreement shall inure to the benefit of the successors and assigns of the Company and, subject to the restrictions on transfer herein set forth, be binding upon Purchaser, Purchaser's successors, and assigns.

        **(c)**    **Attorneys' Fees.** Purchaser shall reimburse the Company for all costs incurred by the Company in enforcing the performance of, or protecting its rights under, any part of this Agreement, including reasonable costs of investigation and attorneys' fees.

Case: 04-05546   Doc# 7-1   Filed: 02/01/05   Entered: 02/01/05 11:12:29   Page 14 of
25

**(d)    Governing Law; Venue.**  This Agreement shall be governed by and construed in accordance with the laws of the State of California.  The parties agree that any action brought by either party to interpret or enforce any provision of this Agreement shall be brought in, and each party agrees to, and does hereby, submit to the jurisdiction and venue of, the appropriate state or federal court for the district encompassing the Company's principal place of business.

**(e)    Further Execution.**  The parties agree to take all such further action(s) as may reasonably be necessary to carry out and consummate this Agreement as soon as practicable, and to take whatever steps may be necessary to obtain any governmental approval in connection with or otherwise qualify the issuance of the securities that are the subject of this Agreement.

**(f)    Independent Counsel.**  Purchaser acknowledges that this Agreement has been prepared on behalf of the Company by Cooley Godward LLP, counsel to the Company, and that Cooley Godward LLP does not represent, and is not acting on behalf of, Purchaser. Purchaser has been provided with an opportunity to consult with Purchaser's own counsel with respect to this Agreement.

**(g)    Entire Agreement; Amendment.**  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes and merges all prior agreements or understandings, whether written or oral.  This Agreement may not be amended, modified or revoked, in whole or in part, except by an agreement in writing signed by each of the parties hereto.

**(h)    Severability.**  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

**(i)    Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

Case: 04-05546    Doc# 7-1    Filed: 02/01/05    Entered: 02/01/05 11:12:29    Page 15 of
25

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

DIGITAL REFLECTION, INC.

By: _Jacque Catlett_

Title: _President / CEO_

Address: 536 N. Santa Cruz Avenue
Los Gatos, CA 95030

PURCHASER:

_____

ICON GROUP LIMITED

Address:
c/o Digital Reflection, Inc.
536 N. Santa Cruz Avenue
Los Gatos, CA 95030

Case: 04-05546    Doc# 7-1    Filed: 02/01/05    Entered: 02/01/05 11:12:29    Page 16 of
25

## STOCK ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, ROBERT P. SCHIRO SENIOR TRUST, hereby sells, assigns and transfers unto DIGITAL REFLECTION, INC., a Nevada corporation (the "Company"), pursuant to the Right of First Refusal under that certain Stock Purchase Agreement dated March 19, 1999, by and between the undersigned and the Company (the "Agreement"), Ninety-Nine Thousand (99,000) shares of Common Stock of the Company standing in the undersigned's name on the books of the Company represented by Certificate No. _____ and does hereby irrevocably constitute and appoint Cooley Godward LLP attorney to transfer said stock on the books of the Company with full power of substitution in the premises. This Assignment may be used only in accordance with and subject to the terms and conditions of the Agreement, in connection with the repurchase of shares of Common Stock issued to the undersigned pursuant to the Agreement, and only to the extent that such shares remain subject to the Company's Right of First Refusal under the Agreement.

Dated: _____

_____
ROBERT P. SCHIRO SENIOR TRUST

## STOCK ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, ROBERT P. SCHIRO SENIOR TRUST, hereby sells, assigns and transfers unto DIGITAL REFLECTION, INC., a Nevada corporation (the "Company"), pursuant to the Right of First Refusal under that certain Stock Purchase Agreement dated March 19, 1999, by and between the undersigned and the Company (the "Agreement"), Ninety-Nine Thousand (99,000) shares of Common Stock of the Company standing in the undersigned's name on the books of the Company represented by Certificate No. _____ and does hereby irrevocably constitute and appoint Cooley Godward LLP attorney to transfer said stock on the books of the Company with full power of substitution in the premises. This Assignment may be used only in accordance with and subject to the terms and conditions of the Agreement, in connection with the repurchase of shares of Common Stock issued to the undersigned pursuant to the Agreement, and only to the extent that such shares remain subject to the Company's Right of First Refusal under the Agreement.

Dated: _____

ROBERT P. SCHIRO SENIOR TRUST

# STOCK ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, ROBERT P. SCHIRO SENIOR TRUST, hereby sells, assigns and transfers unto DIGITAL REFLECTION, INC., a Nevada corporation (the "Company"), pursuant to the Right of First Refusal under that certain Stock Purchase Agreement dated March 19, 1999, by and between the undersigned and the Company (the "Agreement"), Ninety-Nine Thousand (99,000) shares of Common Stock of the Company standing in the undersigned's name on the books of the Company represented by Certificate No. _____ and does hereby irrevocably constitute and appoint Cooley Godward LLP attorney to transfer said stock on the books of the Company with full power of substitution in the premises. This Assignment may be used only in accordance with and subject to the terms and conditions of the Agreement, in connection with the repurchase of shares of Common Stock issued to the undersigned pursuant to the Agreement, and only to the extent that such shares remain subject to the Company's Right of First Refusal under the Agreement.

Dated: _____

ROBERT P. SCHIRO SENIOR TRUST



THIS CERTIFIES THAT *Robert P. Schiro Senior Trust is the record holder of Ninety-Nine Thousand (99,000) shares of the Common Stock of* DIGITAL REFLECTION, INC., *transferable only on the books of the Company by the holder hereof, in person or by attorney, upon surrender of this Certificate properly endorsed or assigned.*

IN WITNESS WHEREOF, *the said Company has caused this Certificate to be signed by its duly authorized officers as of this 14th day of June, 1999.*

Secretary

President



THIS CERTIFIES THAT *Joseph R. Kafka and Deborah Siebrandt are the record holders of Six Thousand (6,000) shares of the Common Stock of DIGITAL REFLECTION, INC., transferable only on the books of the Company by the holder hereof, in person or by attorney, upon surrender of this Certificate properly endorsed or assigned.*

*In WITNESS WHEREOF, the said Company has caused this Certificate to be signed by its duly authorized officers as of this 14th day of June, 1999.*

_____ Secretary

_____ President

SEE LEGENDS ON REVERSE



THIS CERTIFIES THAT *Demetrius Barrous* is the record holder of Two Thousand (2,000) shares of the Common Stock of DIGITAL REFLECTION, INC., transferable only on the books of the Company by the holder hereof, in person or by attorney, upon surrender of this Certificate properly endorsed or assigned.

IN WITNESS WHEREOF, the said Company has caused this Certificate to be signed by its duly authorized officers as of this 9th day of June, 1999.

_____
Secretary

_____
President

SEE LEGENDS ON REVERSE

EACH

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (the "Agreement") is entered into as of March 1, 2000, by and between ICON Group Limited, a Cayman Islands corporation (the "Seller"), and the several purchasers listed on Exhibit A hereto (each a "Purchaser" and together the "Purchasers").

### RECITALS

WHEREAS, the Seller owns Four Million Three Hundred Seventy Thousand (4,370,000) shares of common stock (the "Common Stock") of Digital Reflection, Inc., a Nevada corporation (the "Company"), and desires to sell that number of shares set forth opposite each Purchaser's name on Exhibit A hereto;

WHEREAS, each Purchaser desires to purchase severally and not jointly and the Seller desires to sell to each Purchaser that number of shares of Common Stock set forth opposite each such Purchaser's name on Exhibit A attached hereto on the terms and conditions set forth herein. The shares of Common Stock of the Company sold to Purchasers pursuant to this Agreement shall be hereinafter referred to as the "Shares."

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises hereinafter set forth, the parties hereto agree as follows:

1.    AGREEMENT TO SELL AND PURCHASE.

   1.1    **Sale and Purchase.** Subject to the terms and conditions hereof, at the Closing (as hereinafter defined) the Seller hereby agrees to sell to each Purchaser, and each Purchaser agrees to purchase severally and not jointly from the Seller, that number of Shares at a purchase price of $10.00 per Share opposite each such Purchaser's name on Exhibit A attached hereto.

2.    CLOSING, DELIVERY AND PAYMENT.

   2.1    **Closing.** The closing of the sale and purchase of the Shares under this Agreement (the "Closing") shall take place at 10:00 a.m. on the date hereof, at the offices of Latham & Watkins, 135 Commonwealth Drive, Menlo Park, CA 94025 or at such other time or place as the Seller and Purchasers may collectively agree (such date is hereinafter referred to as the "Closing Date").

   2.2    **Delivery.** At the Closing, subject to the terms and conditions hereof, the Seller will deliver to each Purchaser a certificate representing the number of Shares to be purchased at the Closing by such Purchaser, against payment of the purchase price therefor by check or wire transfer made payable to the order of the Seller.

3.    REPRESENTATIONS AND WARRANTIES OF THE SELLER.

   The Seller hereby represents warrants to the Purchaser as of the date of this Agreement as follows:

**3.1    Title to Shares.**  Seller is the owner, beneficially and of record, of the Shares, free and clear of any liens, encumbrances, security agreements, equities, options, claims, charges or restrictions and effective with the Closing, Seller's entire right, title and interest in and to the Shares shall have been conveyed to the Purchasers.

**3.2    No Encumbrances.**  When sold in compliance with the provisions of this Agreement, the Shares will be free of any liens or encumbrances, *provided, however*, that the Shares may be subject to restrictions on transfer under state and/or federal securities laws as set forth herein or as otherwise required by such laws at the time a transfer is proposed.

**3.3    Authorization; Binding Obligations.**  The Seller has all requisite corporate power and corporate authority to execute and deliver this Agreement, to sell the Shares and to carry out the provisions of this Agreement.  The Agreement when executed and delivered, will be a valid and binding obligation of the Seller enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (b) general principles of equity that restrict the availability of equitable remedies.  The sale of the Shares is not and will not be subject to any preemptive rights or rights of first refusal that have not been properly complied with or waived.

**3.4    No Consents, Permits or Waivers.**  Seller has obtained any and all consents, permits and waivers necessary or appropriate for the consummation of the transactions contemplated by this Agreement.

**4.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS.**

Each Purchaser hereby severally and not jointly represents and warrants to the Seller as follows:

**4.1    Requisite Power and Authority.**  Purchaser has all necessary power and authority under all applicable provisions of law to executive and deliver this Agreement and to carry out its provisions.  All action on Purchaser's part required for the lawful execution and delivery of this Agreement has been or will be effectively taken prior to the Closing.  Upon execution and delivery, this Agreement will be a valid and binding obligation of the Purchaser, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (b) general principles of equity that restrict the availability of equitable remedies.

**4.2    Investment Representations.**  Purchaser understands that the Shares have not been registered under the Securities Act of 1933, as amended (the "Act").  Purchaser also understands that the Shares are being offered and sold pursuant to an exemption from registration contained in the Act based in part upon Purchaser's representations contained in the Agreement.

**(a)    Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares.  Purchaser is purchasing the**

SF_DOCS\2243762.2 [W97]    Case: 04-05346    Doc# 7-1    Filed: 02/01/05    Entered: 02/01/05 11:12:29    Page 24 of 25

Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Act.

(b)     Purchaser understands that the Shares have not been registered under the Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.  Purchaser Can Protect Its Interest.

(c)     Purchaser further acknowledges and understands that the Shares must be held indefinitely unless the Shares are subsequently registered under the Act or an exemption from such registration is available.  Purchaser understands that the certificate evidencing the Shares will be imprinted with a legend which prohibits the transfer of the Shares unless the Shares are registered or such registration is not required in the opinion of counsel for the Company.

(d)     Purchaser is familiar with the provisions of Rules 144 and 701, under the Act, as in effect from time to time, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.  Rule 701 provides that if the issuer qualifies under Rule 701 at the time issuance of the securities, such issuance will be exempt from registration under the Act.  In the event the Company becomes subject to the reporting requirements of Sections 13 or 15(d) of the Securities Exchange Act of 1934, the securities exempt under Rule 701 may be sold by Purchaser ninety (90) days thereafter, subject to the satisfaction of certain of the conditions specified by Rule 144 and the market stand-off provision described below.

In the event that the sale of the Shares does not qualify under Rule 701 at the time of purchase, then the Shares may be resold by Purchaser in certain limited circumstances subject to the provisions of Rule 144, which requires, among other things: (i) the availability of certain public information about the Company and (ii) the resale occurring following the required holding period under Rule 144 after the Purchaser has purchased, and made full payment of (within the meaning of Rule 144), the securities to be sold.

(e)     Purchaser represents that Purchaser is an accredited investor within the meaning of Regulation D under the Act.

(f)     Purchaser further understands that at the time Purchaser wishes to sell the Shares there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public current information requirements of Rule 144 or 701, and that, in such event, Purchaser would be precluded from selling the Shares under Rule 144 or 701 even if the minimum holding period requirement had been satisfied.

(g)     The office or offices of Purchaser in which its investment decision was made is located at the address or addresses of the Purchaser set forth on the signature page hereto.

3

Case: 04-05546    Doc# 7-1    Filed: 02/01/05    Entered: 02/01/05 11:12:29    Page 25 of 25