(h)    Purchaser further warrants and represents that Purchaser has either (i) preexisting personal or business relationships with the Company or any of its officers, directors or controlling persons, or (ii) the capacity to protect its own interests in connection with the purchase of the Shares by virtue of the business or financial expertise of itself or of professional advisors to Purchaser who are unaffiliated with and who are not compensated by the Company or any of its affiliates directly or indirectly.

4.3    **Transfer Restrictions.** Each Purchaser acknowledges and agrees that the Shares are subject to restrictions on transfer including a right of first-refusal in favor of the Company as set forth in the Founder Stock Purchaser Agreement dated August 30, 1997 by and between Seller and the Company (the "Founder Agreement"), a copy of which is attached hereto as Exhibit B and incorporated herein by this reference.  Each Purchaser further agrees that such Purchaser shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as sale, any Common Stock of the Company held by such Purchaser, including the Shares (the "Restricted Securities"), for a period of time specified by the underwriter(s) (not to exceed one hundred eighty (180) days) following the effective date of the initial registration statement of the Company filed under the Act.  Each Purchaser agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the underwriter(s) which are consistent with the foregoing covenant, the Company may impose stop-transfer instructions with respect to such Purchaser's Restricted Securities until the end of such period.

5.    **MISCELLANEOUS.**

5.1    **Governing Law.**  This Agreement shall be governed in all respects by the laws of the State of California applicable to agreements between California residents entered into and performed entirely in California, without regard to principles of conflicts of laws.

5.2    **Successors and Assigns.**  Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto and shall inure to the benefit of and be enforceable by each person who shall be a holder of the Shares from time to time.

5.3    **Entire Agreement.**  This Agreement and Exhibits hereto, the Founder Agreement and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof, and no party shall be liable or bound to any other in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein and therein.

5.4    **Severability.**  In case any provision of the Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provision shall not in any way be affected or impaired thereby.

5.5    **Notices.**  All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five (5) days after having been sent by registered or

Case: 04-05546    Doc# 7-2    Filed: 02/01/05    Entered: 02/01/05 11:12:29    Page 1 of 31

certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Seller at the address as set forth on the signature page hereof and to Purchaser at the address set forth on signature page hereof or at such other address as the Seller or Purchaser may designate by ten (10) days advance written notice to the other parties hereto.

     **5.6    Titles and Subtitles.** The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

     **5.7    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

     **5.8    Expenses.** Each party shall be responsible for its own fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including any broker or finder fees.

     **5.9    THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSION OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION OR IN THE ABSENCE OF AN EXEMPTION FROM SUCH QUALIFICATION IS UNLAWFUL. PRIOR TO ACCEPTANCE OF SUCH CONSIDERATION BY THE SELLER, THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION FROM SUCH QUALIFICATION BEING AVAILABLE.**

SF_DOCS\224376.2 [W97]

Case: 04-05546   Doc# 7-2   Filed: 02/01/05   Entered: 02/01/05 11:12:29   Page 2 of 31

IN WITNESS WHEREOF, the parties hereto have executed this **Agreement** as of the date set forth in the first paragraph hereof.

**SELLER:**

ICON GROUP LIMITED

By: _____

c/o Digital Reflection, Inc.
644 University Avenue
Los Gatos, CA 95030

**PURCHASER:**

Robert P. Schiro

By: _____

13902 Upper Hill Ct.
Saratoga, CA 95070

# EXHIBIT A

## SCHEDULE OF PURCHASERS

| NAME | NUMBER OF SHARES | PURCHASE PRICE |
|------|------------------|----------------|
| *Robert P. Schiro* | 1,200 | $12,000.00 |
| Total | 1,200 | $12,000.00 |

## EXHIBIT B

## FOUNDER STOCK PURCHASE AGREEMENT

THIS FOUNDER STOCK PURCHASE AGREEMENT (the "Agreement") is made as of the 30th day of August, 1997, by and between Digital Reflection, Inc., a Nevada corporation (the "Company"), and Icon Group Limited, a Cayman Islands corporation ("Purchaser").

WHEREAS, pursuant to Section 78.200 of the Nevada General Corporation Law, the Company desires to issue, and Purchaser desires to acquire, stock of the Company as herein described, on the terms and conditions hereinafter set forth;

WHEREAS, the issuance of common stock hereby is in connection with a compensatory benefit plan for the employees, directors, officers, advisers or consultants of the Company and is intended to comply with the provisions of Rule 701 promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Act").

NOW, THEREFORE, IT IS AGREED between the parties as follows:

1.     PURCHASE AND SALE OF STOCK. Purchaser hereby agrees to purchase from the Company, and the Company hereby agrees to sell to Purchaser, an aggregate of Four Million Seven Hundred Fifty Thousand (4,750,000) shares of the Common Stock of the Company (the "Stock") at $0.001053 per share, for an aggregate purchase price of $5,001.75, payable as follows:

Cash.................................................................................................................$5,001.75

The closing hereunder, including payment for and delivery of the Stock shall occur at the offices of the Company immediately following the execution of this Agreement, or at such other time and place as the parties may mutually agree.

2.     RIGHT OF FIRST REFUSAL. Before any Stock registered in the name of Purchaser may be sold or transferred (including transfer by operation of law) other than as set forth in Section (f) below, such shares shall first be offered to the Company, which will have the right to purchase all or any part of the Stock proposed to be transferred ("Right of First Refusal"), in the following manner:

(a) Purchaser or his or her legal representative shall first give written notice (the "Transfer Notice") of any proposed transfer to the Company. The Transfer Notice shall name the proposed transferee, state the number of shares of Stock to be transferred, and if the transfer is voluntary, the price per share and all other terms of the offer. The Transfer Notice shall be signed by Purchaser or his or her representative and the prospective transferee and must constitute a binding agreement for the transfer of the Stock subject only to the Right of First Refusal.

(b) Within thirty (30) days of delivery of Purchaser's notice of a proposed voluntary transfer, the Company's Board of Directors shall determine the bona fide nature of the proposed voluntary transfer and give Purchaser written notice of its determination. If the proposed transfer is deemed to be bona fide, the remaining subsections of this section shall apply to the sale. If the proposed transfer is deemed not to be bona fide, Purchaser will be responsible for providing additional information to the Board of Directors of the Company to show the bona fide nature of the proposed transfer and no Stock will be transferred on the books of the Company until the Board of Directors of the Company has approved the proposed transfer as bona fide.

(c) If the Company fails to exercise in full the Right of First Refusal within thirty (30) days from the later of the date the Transfer Notice is delivered to the Company or thirty (30) days after the date the transfer is determined to be bona fide (if Purchaser is required to provide additional information as provided in Section 2(b) above), Purchaser may, not later than one hundred twenty (120) days following delivery to the Company of the Transfer Notice, conclude a transfer of the shares of Stock subject to the Transfer Notice which have not been purchased by the Company pursuant to exercise of the Right of First Refusal on the terms and conditions described in the Transfer Notice. Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by Purchaser, shall again be subject to the Right of First Refusal and shall require compliance by Purchaser with the procedure described in this Section 2. If the Company exercises the Right of First Refusal, the parties shall consummate the sale of shares of Stock on the terms set forth in the Transfer Notice by the later of sixty (60) days after the delivery of the Transfer Notice to the Company or thirty (30) days after the date the transfer is determined to be bona fide (if Purchaser is required to provide additional information as provided in Section 2(b) above); provided, however, in the event the Transfer Notice provides for the payment for the shares of Stock other than in cash, the Company shall have the option of paying for the shares of Stock by the discounted cash equivalent of the consideration described in the Transfer Notice as reasonably determined by the Company.

(d) All transferees of shares of Stock or any interest therein other than the Company shall be required as a condition of such transfer to agree in writing (in a form satisfactory to the Company) that they will receive and hold such shares of Stock or interests subject to the provisions of this Agreement, including the Right of First Refusal.

(e) The Right of First Refusal shall terminate at such time as a public market exists for the Company's Common Stock (or any other stock issued by the Company, or any successor, in exchange for the Stock). For the purpose of this Agreement, a "public market" shall be deemed to exist if (i) such stock is listed on a national securities exchange (as that term is used in the Securities Exchange Act of 1934) or (ii) such stock is traded on the over-the-counter market and prices therefore are published daily on business days in a recognized financial journal.

(f) The Right of First Refusal shall not apply to any transfer to Purchaser's ancestors or descendants or spouse or to a trustee for their benefit, provided that in any case any such transferee shall agree with the Company in writing (in a form satisfactory to the Company) to take the Stock subject to all the terms of this Agreement, including the Right of First Refusal.

3.     ESCROW OF STOCK.  As security for Purchaser's faithful performance of the terms of this Agreement and to insure the availability for delivery of Purchaser's Stock upon exercise of the Right of First Refusal, Purchaser agrees, at the closing hereunder, to deliver to and deposit with the Secretary of the Company or the Secretary's designee ("Escrow Agent"), as Escrow Agent in this transaction, three (3) stock assignments duly endorsed (with date and number of shares blank) in the form attached hereto as **Exhibit B,** together with a certificate or certificates evidencing all of the Stock; said documents are to be held by the Escrow Agent and delivered by said Escrow Agent pursuant to the Joint Escrow Instructions of the Company and Purchaser set forth in **Exhibit C** attached hereto and incorporated by this reference, which instructions shall also be delivered to the Escrow Agent at the closing hereunder.

4.     RIGHTS OF PURCHASER.  Subject to the provisions of Sections 2 and 3 herein, Purchaser shall exercise all rights and privileges of a stockholder of the Company with respect to the Stock.

5.     LIMITATIONS ON TRANSFER. Purchaser shall not assign, hypothecate, donate, encumber or otherwise dispose of any interest in the Stock except in compliance with the provisions herein and applicable securities laws.  Furthermore, the Stock shall be subject to any right of first refusal in favor of the Company or its assignees that may be contained in the Company's Bylaws.

6.     RESTRICTIVE LEGENDS.  All certificates representing the Stock shall have endorsed thereon legends in substantially the following forms (in addition to any other legend which may be required by other agreements between the parties hereto):

(a) "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

(b) "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY AND/OR ITS ASSIGNEE(S) AS PROVIDED IN THE FOUNDER STOCK PURCHASE AGREEMENT BY AND BETWEEN THE COMPANY AND THE PURCHASER."

(c) Any legend required by appropriate blue sky officials.

7.     INVESTMENT REPRESENTATIONS.  In connection with the purchase of the Stock, Purchaser represents to the Company the following:

(a) Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Stock.  Purchaser is purchasing the Stock for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Act.

**(b)** Purchaser understands that the Stock has not been registered under the Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

**(c)** Purchaser further acknowledges and understands that the Stock must be held indefinitely unless the Stock is subsequently registered under the Act or an exemption from such registration is available. Purchaser understands that the certificate evidencing the Stock will be imprinted with a legend which prohibits the transfer of the Stock unless the Stock is registered or such registration is not required in the opinion of counsel for the Company.

**(d)** Purchaser is familiar with the provisions of Rules 144 and 701, under the Act, as in effect from time to time, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of issuance of the securities, such issuance will be exempt from registration under the Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the securities exempt under Rule 701 may be sold by Purchaser ninety (90) days thereafter, subject to the satisfaction of certain of the conditions specified by Rule 144 and the market stand-off provision described in Section 8 below.

In the event that the sale of the Stock does not qualify under Rule 701 at the time of purchase, then the Stock may be resold by Purchaser in certain limited circumstances subject to the provisions of Rule 144, which requires, among other things: (i) the availability of certain public information about the Company and (ii) the resale occurring following the required holding period under Rule 144 after the Purchaser has purchased, and made full payment of (within the meaning of Rule 144), the securities to be sold.

**(e)** Purchaser further understands that at the time Purchaser wishes to sell the Stock there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public current information requirements of Rule 144 or 701, and that, in such event, Purchaser would be precluded from selling the Stock under Rule 144 or 701 even if the minimum holding period requirement had been satisfied.

**(f)** Purchaser further warrants and represents that Purchaser has either (i) preexisting personal or business relationships, with the Company or any of its officers, directors or controlling persons, or (ii) the capacity to protect his own interests in connection with the purchase of the Stock by virtue of the business or financial expertise of himself or of professional advisors to Purchaser who are unaffiliated with and who are not compensated by the Company or any of its affiliates, directly or indirectly.

8. **MARKET STAND-OFF AGREEMENT.** Purchaser shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, any Common Stock of the Company held by Purchaser, including the Stock (the "Restricted Securities"), for a period of time specified by the underwriter(s) (not to exceed one hundred eighty (180) days) following the effective date of the

initial registration statement of the Company filed under the Act. Purchaser agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the underwriter(s) which are consistent with the foregoing or which are necessary to give further effect thereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to Purchaser's Restricted Securities until the end of such period.

9. **REFUSAL TO TRANSFER.** The Company shall not be required (a) to transfer on its books any shares of Stock of the Company which shall have been transferred in violation of any of the provisions set forth in this Agreement or (b) to treat as owner of such shares or to accord the right to vote as such owner or to pay dividends to any transferee to whom such shares shall have been so transferred.

10. **NO EMPLOYMENT RIGHTS.** As a condition to the sale and purchase of the Stock pursuant to this Agreement, Purchaser agrees to execute an Employee Proprietary Information and Inventions Agreement in the form attached hereto as **Exhibit A.** Notwithstanding Purchaser's agreement to execute such agreement, this Agreement is not an employment contract and nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company (or a parent or subsidiary of the Company) to terminate Purchaser's employment for any reason at any time, with or without cause and with or without notice.

11. **MISCELLANEOUS.**

(a) **Notices.** Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or upon confirmed delivery by telegram or fax or five (5) days following deposit in the United States mail, by registered or certified mail with postage and fees prepaid, addressed to the other party hereto at his address hereinafter shown below its signature or at such other address as such party may designate by ten (10) days' advance written notice to the other party hereto.

(b) **Successors and Assigns.** This Agreement shall inure to the benefit of the successors and assigns of the Company and, subject to the restrictions on transfer herein set forth, be binding upon Purchaser, Purchaser's successors, and assigns.

(c) **Attorneys' Fees.** Purchaser shall reimburse the Company for all costs incurred by the Company in enforcing the performance of, or protecting its rights under, any part of this Agreement, including reasonable costs of investigation and attorneys' fees.

(d) **Governing Law; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of California. The parties agree that any action brought by either party to interpret or enforce any provision of this Agreement shall be brought in, and each party agrees to, and does hereby, submit to the jurisdiction and venue of, the appropriate state or federal court for the district encompassing the Company's principal place of business.

(e) **Further Execution.** The parties agree to take all such further action(s) as may reasonably be necessary to carry out and consummate this Agreement as soon as practicable, and to take whatever steps may be necessary to obtain any governmental approval in connection with or otherwise qualify the issuance of the securities that are the subject of this Agreement.

**(f) Independent Counsel.** Purchaser acknowledges that this Agreement has been prepared on behalf of the Company by Cooley Godward LLP, counsel to the Company, and that Cooley Godward LLP does not represent, and is not acting on behalf of, Purchaser. Purchaser has been provided with an opportunity to consult with Purchaser's own counsel with respect to this Agreement.

**(g) Entire Agreement; Amendment.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes and merges all prior agreements or understandings, whether written or oral. This Agreement may not be amended, modified or revoked, in whole or in part, except by an agreement in writing signed by each of the parties hereto.

**(h) Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

**(i) Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

DIGITAL REFLECTION, INC.

By:_____

Title:_____

Address:　644 University Avenue
　　　　　　Los Gatos, CA 95030

PURCHASER:

_____

ICON GROUP LIMITED

Address:

　　　　　c/o Digital Reflection, Inc.
　　　　　644 University Avenue
　　　　　Los Gatos, CA 95030



THIS CERTIFIES THAT Robert P. Schryer is the registered holder of One Thousand Two Hundred (1,200) shares of the Series A Preferred Stock of Digital Reflection, Inc. transferable only on the books of the Corporation by the holder hereof in person or by attorney upon surrender of this certificate properly endorsed.

This certificate and the shares represented hereby are issued and shall be held subject to all the provisions of the Articles of Incorporation and the Bylaws of the Corporation and any amendments thereto, to all of which the holder of this certificate, by acceptance hereof, assents.

The shares represented by this certificate are convertible into Common Stock on the terms and on the terms as set forth in the Articles of Incorporation of the Corporation.

The Corporation is authorized to issue two classes of stock, Common Stock and Preferred Stock. A statement of all of the rights, preferences, privileges and restrictions granted to or imposed upon the respective classes of series of shares of stock of the Corporation and upon the holders thereof as established by the Articles of Incorporation may be obtained by any stockholder upon request at the principal office of the Corporation, and the Corporation will furnish any stockholder, upon request and without charge, a copy of such statement.

IN WITNESS WHEREOF, the said Corporation has caused this certificate to be signed by its duly authorized officers as of this 1st day of May, 2000.

President _____

Secretary _____

GOES 911-698
All Rights Reserved

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (the "Agreement") is entered into as of March 1, 2000, by and between ICON Group Limited, a Cayman Islands corporation (the "Seller"), and the several purchasers listed on Exhibit A hereto (each a "Purchaser" and together the "Purchasers").

## RECITALS

WHEREAS, the Seller owns Four Million Three Hundred Seventy Thousand (4,370,000) shares of common stock (the "Common Stock") of Digital Reflection, Inc., a Nevada corporation (the "Company"), and desires to sell that number of shares set forth opposite each Purchaser's name on Exhibit A hereto;

WHEREAS, each Purchaser desires to purchase severally and not jointly and the Seller desires to sell to each Purchaser that number of shares of Common Stock set forth opposite each such Purchaser's name on Exhibit A attached hereto on the terms and conditions set forth herein. The shares of Common Stock of the Company sold to Purchasers pursuant to this Agreement shall be hereinafter referred to as the "Shares."

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **AGREEMENT TO SELL AND PURCHASE.**

    **1.1 Sale and Purchase.** Subject to the terms and conditions hereof, at the Closing (as hereinafter defined) the Seller hereby agrees to sell to each Purchaser, and each Purchaser agrees to purchase severally and not jointly from the Seller, that number of Shares at a purchase price of $10.00 per Share opposite each such Purchaser's name on Exhibit A attached hereto.

2. **CLOSING, DELIVERY AND PAYMENT.**

    **2.1 Closing.** The closing of the sale and purchase of the Shares under this Agreement (the "Closing") shall take place at 10:00 a.m. on the date hereof, at the offices of Latham & Watkins, 135 Commonwealth Drive, Menlo Park, CA 94025 or at such other time or place as the Seller and Purchasers may collectively agree (such date is hereinafter referred to as the "Closing Date").

    **2.2 Delivery.** At the Closing, subject to the terms and conditions hereof, the Seller will deliver to each Purchaser a certificate representing the number of Shares to be purchased at the Closing by such Purchaser, against payment of the purchase price therefor by check or wire transfer made payable to the order of the Seller.

3. **REPRESENTATIONS AND WARRANTIES OF THE SELLER.**

    The Seller hereby represents warrants to the Purchaser as of the date of this Agreement as follows:

**3.1    Title to Shares.**  Seller is the owner, beneficially and of record, of the Shares, free and clear of any liens, encumbrances, security agreements, equities, options, claims, charges or restrictions and effective with the Closing, Seller's entire right, title and interest in and to the Shares shall have been conveyed to the Purchasers.

**3.2    No Encumbrances.**  When sold in compliance with the provisions of this Agreement, the Shares will be free of any liens or encumbrances, *provided, however*, that the Shares may be subject to restrictions on transfer under state and/or federal securities laws as set forth herein or as otherwise required by such laws at the time a transfer is proposed.

**3.3    Authorization; Binding Obligations.**  The Seller has all requisite corporate power and corporate authority to execute and deliver this Agreement, to sell the Shares and to carry out the provisions of this Agreement.  The Agreement when executed and delivered, will be a valid and binding obligation of the Seller enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (b) general principles of equity that restrict the availability of equitable remedies.  The sale of the Shares is not and will not be subject to any preemptive rights or rights of first refusal that have not been properly complied with or waived.

**3.4    No Consents, Permits or Waivers.**  Seller has obtained any and all consents, permits and waivers necessary or appropriate for the consummation of the transactions contemplated by this Agreement.

**4.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS.**

Each Purchaser hereby severally and not jointly represents and warrants to the Seller as follows:

**4.1    Requisite Power and Authority.**  Purchaser has all necessary power and authority under all applicable provisions of law to execute and deliver this Agreement and to carry out its provisions.  All action on Purchaser's part required for the lawful execution and delivery of this Agreement has been or will be effectively taken prior to the Closing.  Upon execution and delivery, this Agreement will be a valid and binding obligation of the Purchaser, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (b) general principles of equity that restrict the availability of equitable remedies.

**4.2    Investment Representations.**  Purchaser understands that the Shares have not been registered under the Securities Act of 1933, as amended (the "Act").  Purchaser also understands that the Shares are being offered and sold pursuant to an exemption from registration contained in the Act based in part upon Purchaser's representations contained in the Agreement.

**(a)    Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares.  Purchaser is purchasing the**

2

Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Act.

(b) Purchaser understands that the Shares have not been registered under the Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein. Purchaser Can Protect Its Interest.

(c) Purchaser further acknowledges and understands that the Shares must be held indefinitely unless the Shares are subsequently registered under the Act or an exemption from such registration is available. Purchaser understands that the certificate evidencing the Shares will be imprinted with a legend which prohibits the transfer of the Shares unless the Shares are registered or such registration is not required in the opinion of counsel for the Company.

(d) Purchaser is familiar with the provisions of Rules 144 and 701, under the Act, as in effect from time to time, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time issuance of the securities, such issuance will be exempt from registration under the Act. In the event the Company becomes subject to the reporting requirements of Sections 13 or 15(d) of the Securities Exchange Act of 1934, the securities exempt under Rule 701 may be sold by Purchaser ninety (90) days thereafter, subject to the satisfaction of certain of the conditions specified by Rule 144 and the market stand-off provision described below.

In the event that the sale of the Shares does not qualify under Rule 701 at the time of purchase, then the Shares may be resold by Purchaser in certain limited circumstances subject to the provisions of Rule 144, which requires, among other things: (i) the availability of certain public information about the Company and (ii) the resale occurring following the required holding period under Rule 144 after the Purchaser has purchased, and made full payment of (within the meaning of Rule 144), the securities to be sold.

(e) Purchaser represents that Purchaser is an accredited investor within the meaning of Regulation D under the Act.

(f) Purchaser further understands that at the time Purchaser wishes to sell the Shares there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public current information requirements of Rule 144 or 701, and that, in such event, Purchaser would be precluded from selling the Shares under Rule 144 or 701 even if the minimum holding period requirement had been satisfied.

(g) The office or offices of Purchaser in which its investment decision was made is located at the address or addresses of the Purchaser set forth on the signature page hereto.

3

**(h)** Purchaser further warrants and represents that Purchaser has either (i) preexisting personal or business relationships with the Company or any of its officers, directors or controlling persons, or (ii) the capacity to protect its own interests in connection with the purchase of the Shares by virtue of the business or financial expertise of itself or of professional advisors to Purchaser who are unaffiliated with and who are not compensated by the Company or any of its affiliates directly or indirectly.

**4.3    Transfer Restrictions.** Each Purchaser acknowledges and agrees that the Shares are subject to restrictions on transfer including a right of first-refusal in favor of the Company as set forth in the Founder Stock Purchaser Agreement dated August 30, 1997 by and between Seller and the Company (the "Founder Agreement"), a copy of which is attached hereto as Exhibit B and incorporated herein by this reference. Each Purchaser further agrees that such Purchaser shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as sale, any Common Stock of the Company held by such Purchaser, including the Shares (the "Restricted Securities"), for a period of time specified by the underwriter(s) (not to exceed one hundred eighty (180) days) following the effective date of the initial registration statement of the Company filed under the Act. Each Purchaser agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the underwriter(s) which are consistent with the foregoing covenant, the Company may impose stop-transfer instructions with respect to such Purchaser's Restricted Securities until the end of such period.

**5.    MISCELLANEOUS.**

**5.1    Governing Law.** This Agreement shall be governed in all respects by the laws of the State of California applicable to agreements between California residents entered into and performed entirely in California, without regard to principles of conflicts of laws.

**5.2    Successors and Assigns.** Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto and shall inure to the benefit of and be enforceable by each person who shall be a holder of the Shares from time to time.

**5.3    Entire Agreement.** This Agreement and Exhibits hereto, the Founder Agreement and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof, and no party shall be liable or bound to any other in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein and therein.

**5.4    Severability.** In case any provision of the Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provision shall not in any way be affected or impaired thereby.

**5.5    Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five (5) days after having been sent by registered or

4

Case: 04-05546    Doc# 7-2    Filed: 02/01/05    Entered: 02/01/05 11:12:29    Page 16 of 31

certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Seller at the address as set forth on the signature page hereof and to Purchaser at the address set forth on signature page hereof or at such other address as the Seller or Purchaser may designate by ten (10) days advance written notice to the other parties hereto.

       **5.6**    **Titles and Subtitles.** The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

       **5.7**    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

       **5.8**    **Expenses.** Each party shall be responsible for its own fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including any broker or finder fees.

       **5.9**    **THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSION OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION OR IN THE ABSENCE OF AN EXEMPTION FROM SUCH QUALIFICATION IS UNLAWFUL. PRIOR TO ACCEPTANCE OF SUCH CONSIDERATION BY THE SELLER, THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION FROM SUCH QUALIFICATION BEING AVAILABLE.**

5

IN WITNESS WHEREOF, the parties hereto have executed this **Agreement** as of the date set forth in the first paragraph hereof.

SELLER:                                    PURCHASER:

ICON GROUP LIMITED                         Robert P. Schiro

By: _____               By: _____

c/o Digital Reflection, Inc.               13902 Upper Hill Ct.
644 University Avenue                       Saratoga, CA 95070
Los Gatos, CA 95030

## EXHIBIT A

### SCHEDULE OF PURCHASERS

| NAME | NUMBER OF SHARES | PURCHASE PRICE |
|------|------------------|----------------|
| *Robert P. Schiro* | 1,000 | $10,000.00 |
| Total | 1,000 | $10,000.00 |

## EXHIBIT B

## FOUNDER STOCK PURCHASE AGREEMENT

THIS FOUNDER STOCK PURCHASE AGREEMENT (the "Agreement") is made as of the 30th day of August, 1997, by and between Digital Reflection, Inc., a Nevada corporation (the "Company"), and Icon Group Limited, a Cayman Islands corporation ("Purchaser").

WHEREAS, pursuant to Section 78.200 of the Nevada General Corporation Law, the Company desires to issue, and Purchaser desires to acquire, stock of the Company as herein described, on the terms and conditions hereinafter set forth;

WHEREAS, the issuance of common stock hereby is in connection with a compensatory benefit plan for the employees, directors, officers, advisers or consultants of the Company and is intended to comply with the provisions of Rule 701 promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Act").

NOW, THEREFORE, IT IS AGREED between the parties as follows:

1. PURCHASE AND SALE OF STOCK. Purchaser hereby agrees to purchase from the Company, and the Company hereby agrees to sell to Purchaser, an aggregate of Four Million Seven Hundred Fifty Thousand (4,750,000) shares of the Common Stock of the Company (the "Stock") at $0.001053 per share, for an aggregate purchase price of $5,001.75, payable as follows:

Cash......................................................................................................................$5,001.75

The closing hereunder, including payment for and delivery of the Stock shall occur at the offices of the Company immediately following the execution of this Agreement, or at such other time and place as the parties may mutually agree.

2. RIGHT OF FIRST REFUSAL. Before any Stock registered in the name of Purchaser may be sold or transferred (including transfer by operation of law) other than as set forth in Section (f) below, such shares shall first be offered to the Company, which will have the right to purchase all or any part of the Stock proposed to be transferred ("Right of First Refusal"), in the following manner:

(a) Purchaser or his or her legal representative shall first give written notice (the "Transfer Notice") of any proposed transfer to the Company. The Transfer Notice shall name the proposed transferee, state the number of shares of Stock to be transferred, and if the transfer is voluntary, the price per share and all other terms of the offer. The Transfer Notice shall be signed by Purchaser or his or her representative and the prospective transferee and must constitute a binding agreement for the transfer of the Stock subject only to the Right of First Refusal.

**(b)** Within thirty (30) days of delivery of Purchaser's notice of a proposed voluntary transfer, the Company's Board of Directors shall determine the bona fide nature of the proposed voluntary transfer and give Purchaser written notice of its determination. If the proposed transfer is deemed to be bona fide, the remaining subsections of this section shall apply to the sale. If the proposed transfer is deemed not to be bona fide, Purchaser will be responsible for providing additional information to the Board of Directors of the Company to show the bona fide nature of the proposed transfer and no Stock will be transferred on the books of the Company until the Board of Directors of the Company has approved the proposed transfer as bona fide.

**(c)** If the Company fails to exercise in full the Right of First Refusal within thirty (30) days from the later of the date the Transfer Notice is delivered to the Company or thirty (30) days after the date the transfer is determined to be bona fide (if Purchaser is required to provide additional information as provided in Section 2(b) above), Purchaser may, not later than one hundred twenty (120) days following delivery to the Company of the Transfer Notice, conclude a transfer of the shares of Stock subject to the Transfer Notice which have not been purchased by the Company pursuant to exercise of the Right of First Refusal on the terms and conditions described in the Transfer Notice. Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by Purchaser, shall again be subject to the Right of First Refusal and shall require compliance by Purchaser with the procedure described in this Section 2. If the Company exercises the Right of First Refusal, the parties shall consummate the sale of shares of Stock on the terms set forth in the Transfer Notice by the later of sixty (60) days after the delivery of the Transfer Notice to the Company or thirty (30) days after the date the transfer is determined to be bona fide (if Purchaser is required to provide additional information as provided in Section 2(b) above); provided, however, in the event the Transfer Notice provides for the payment for the shares of Stock other than in cash, the Company shall have the option of paying for the shares of Stock by the discounted cash equivalent of the consideration described in the Transfer Notice as reasonably determined by the Company.

**(d)** All transferees of shares of Stock or any interest therein other than the Company shall be required as a condition of such transfer to agree in writing (in a form satisfactory to the Company) that they will receive and hold such shares of Stock or interests subject to the provisions of this Agreement, including the Right of First Refusal.

**(e)** The Right of First Refusal shall terminate at such time as a public market exists for the Company's Common Stock (or any other stock issued by the Company, or any successor, in exchange for the Stock). For the purpose of this Agreement, a "public market" shall be deemed to exist if (i) such stock is listed on a national securities exchange (as that term is used in the Securities Exchange Act of 1934) or (ii) such stock is traded on the over-the-counter market and prices therefore are published daily on business days in a recognized financial journal.

**(f)** The Right of First Refusal shall not apply to any transfer to Purchaser's ancestors or descendants or spouse or to a trustee for their benefit, provided that in any case any such transferee shall agree with the Company in writing (in a form satisfactory to the Company) to take the Stock subject to all the terms of this Agreement, including the Right of First Refusal.

3. **ESCROW OF STOCK.** As security for Purchaser's faithful performance of the terms of this Agreement and to insure the availability for delivery of Purchaser's Stock upon exercise of the Right of First Refusal, Purchaser agrees, at the closing hereunder, to deliver to and deposit with the Secretary of the Company or the Secretary's designee ("Escrow Agent"), as Escrow Agent in this transaction, three (3) stock assignments duly endorsed (with date and number of shares blank) in the form attached hereto as **Exhibit B,** together with a certificate or certificates evidencing all of the Stock; said documents are to be held by the Escrow Agent and delivered by said Escrow Agent pursuant to the Joint Escrow Instructions of the Company and Purchaser set forth in **Exhibit C** attached hereto and incorporated by this reference, which instructions shall also be delivered to the Escrow Agent at the closing hereunder.

4. **RIGHTS OF PURCHASER.** Subject to the provisions of Sections 2 and 3 herein, Purchaser shall exercise all rights and privileges of a stockholder of the Company with respect to the Stock.

5. **LIMITATIONS ON TRANSFER.** Purchaser shall not assign, hypothecate, donate, encumber or otherwise dispose of any interest in the Stock except in compliance with the provisions herein and applicable securities laws. Furthermore, the Stock shall be subject to any right of first refusal in favor of the Company or its assignees that may be contained in the Company's Bylaws.

6. **RESTRICTIVE LEGENDS.** All certificates representing the Stock shall have endorsed thereon legends in substantially the following forms (in addition to any other legend which may be required by other agreements between the parties hereto):

(a) "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

(b) "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY AND/OR ITS ASSIGNEE(S) AS PROVIDED IN THE FOUNDER STOCK PURCHASE AGREEMENT BY AND BETWEEN THE COMPANY AND THE PURCHASER."

(c) Any legend required by appropriate blue sky officials.

7. **INVESTMENT REPRESENTATIONS.** In connection with the purchase of the Stock, Purchaser represents to the Company the following:

(a) Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Stock. Purchaser is purchasing the Stock for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Act.

(b) Purchaser understands that the Stock has not been registered under the Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c) Purchaser further acknowledges and understands that the Stock must be held indefinitely unless the Stock is subsequently registered under the Act or an exemption from such registration is available. Purchaser understands that the certificate evidencing the Stock will be imprinted with a legend which prohibits the transfer of the Stock unless the Stock is registered or such registration is not required in the opinion of counsel for the Company.

(d) Purchaser is familiar with the provisions of Rules 144 and 701, under the Act, as in effect from time to time, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of issuance of the securities, such issuance will be exempt from registration under the Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the securities exempt under Rule 701 may be sold by Purchaser ninety (90) days thereafter, subject to the satisfaction of certain of the conditions specified by Rule 144 and the market stand-off provision described in Section 8 below.

In the event that the sale of the Stock does not qualify under Rule 701 at the time of purchase, then the Stock may be resold by Purchaser in certain limited circumstances subject to the provisions of Rule 144, which requires, among other things: (i) the availability of certain public information about the Company and (ii) the resale occurring following the required holding period under Rule 144 after the Purchaser has purchased, and made full payment of (within the meaning of Rule 144), the securities to be sold.

(e) Purchaser further understands that at the time Purchaser wishes to sell the Stock there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public current information requirements of Rule 144 or 701, and that, in such event, Purchaser would be precluded from selling the Stock under Rule 144 or 701 even if the minimum holding period requirement had been satisfied.

(f) Purchaser further warrants and represents that Purchaser has either (i) preexisting personal or business relationships, with the Company or any of its officers, directors or controlling persons, or (ii) the capacity to protect his own interests in connection with the purchase of the Stock by virtue of the business or financial expertise of himself or of professional advisors to Purchaser who are unaffiliated with and who are not compensated by the Company or any of its affiliates, directly or indirectly.

8.    MARKET STAND-OFF AGREEMENT. Purchaser shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, any Common Stock of the Company held by Purchaser, including the Stock (the "Restricted Securities"), for a period of time specified by the underwriter(s) (not to exceed one hundred eighty (180) days) following the effective date of the

initial registration statement of the Company filed under the Act. Purchaser agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the underwriter(s) which are consistent with the foregoing or which are necessary to give further effect thereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to Purchaser's Restricted Securities until the end of such period.

9.    **REFUSAL TO TRANSFER.**  The Company shall not be required (a) to transfer on its books any shares of Stock of the Company which shall have been transferred in violation of any of the provisions set forth in this Agreement or (b) to treat as owner of such shares or to accord the right to vote as such owner or to pay dividends to any transferee to whom such shares shall have been so transferred.

10.    **NO EMPLOYMENT RIGHTS.**  As a condition to the sale and purchase of the Stock pursuant to this Agreement, Purchaser agrees to execute an Employee Proprietary Information and Inventions Agreement in the form attached hereto as **Exhibit A.** Notwithstanding Purchaser's agreement to execute such agreement, this Agreement is not an employment contract and nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company (or a parent or subsidiary of the Company) to terminate Purchaser's employment for any reason at any time, with or without cause and with or without notice.

11.    **MISCELLANEOUS.**

(a) **Notices.**  Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or upon confirmed delivery by telegram or fax or five (5) days following deposit in the United States mail, by registered or certified mail with postage and fees prepaid, addressed to the other party hereto at his address hereinafter shown below its signature or at such other address as such party may designate by ten (10) days' advance written notice to the other party hereto.

(b) **Successors and Assigns.**  This Agreement shall inure to the benefit of the successors and assigns of the Company and, subject to the restrictions on transfer herein set forth, be binding upon Purchaser, Purchaser's successors, and assigns.

(c) **Attorneys' Fees.**  Purchaser shall reimburse the Company for all costs incurred by the Company in enforcing the performance of, or protecting its rights under, any part of this Agreement, including reasonable costs of investigation and attorneys' fees.

(d) **Governing Law; Venue.**  This Agreement shall be governed by and construed in accordance with the laws of the State of California. The parties agree that any action brought by either party to interpret or enforce any provision of this Agreement shall be brought in, and each party agrees to, and does hereby, submit to the jurisdiction and venue of, the appropriate state or federal court for the district encompassing the Company's principal place of business.

(e) **Further Execution.**  The parties agree to take all such further action(s) as may reasonably be necessary to carry out and consummate this Agreement as soon as practicable, and to take whatever steps may be necessary to obtain any governmental approval in connection with or otherwise qualify the issuance of the securities that are the subject of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

DIGITAL REFLECTION, INC.

By: _____

Title: _____

Address:  644 University Avenue
          Los Gatos, CA 95030

PURCHASER:

_____

ICON GROUP LIMITED

Address:
          c/o Digital Reflection, Inc.
          644 University Avenue
          Los Gatos, CA 95030



THIS CERTIFIES THAT Robert P. Schiff is the registered holder of One Thousand (*1,000*) shares of the Series A Preferred Stock of Digital Reflection, Inc., transferable only on the books of the Corporation by the holder thereof in person or by attorney upon surrender of this certificate properly endorsed.

This certificate and the shares represented hereby are issued and shall be held subject to all the provisions of the Articles of Incorporation and the Bylaws of the Corporation and any amendments thereto, to all of which the holder of this certificate, by acceptance hereof, assents.

The shares represented by this certificate are convertible into Common Stock at the times and on the terms as set forth in the Articles of Incorporation of the Corporation.

The Corporation is authorized to issue two classes of stock, Common Stock and Preferred Stock. A statement of all of the rights, preferences, privileges and restrictions granted to or imposed upon the respective classes or series of shares of stock of the Corporation and upon the holders thereof, as established by the Articles of Incorporation may be obtained by any stockholder upon request at the principal office of the Corporation, and the Corporation will furnish any stockholder, upon request and without charge, a copy of such statement.

IN WITNESS WHEREOF, the said Corporation has caused this certificate to be signed by its duly authorized officers as of this 1st day of May, 2000.

_____ President

_____ Secretary

# Exhibit B

FORM B10 (Official Form 10)(4/01)

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)**

| Name of Debtor<br>Digital Reflections, Inc. | Case Number: 02-54152-mm<br>Chapter 7<br>Creditor Id: 2901411 |
|---|---|

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Robert P Schiro Sr Trust<br>Name and Address where notices should be sent:<br><br>Robert P Schiro Sr Trust<br>c o Joseph R Kafka Esq<br>1541 The Alameda<br>San Jose CA 95126<br><br>Telephone Number: | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. |

FILED

DEC 1 0 2002

CLERK
United States Bankruptcy Court
San Jose, California

THIS SPACE IS FOR COURT USE ONLY

| Account or other number by which creditor identifies debtor: | Check here if ☐ replaces<br>this claim ☐ amends a previously filed claim, dated |
|---|---|

| 1. Basis for Claim | |
|---|---|
| ☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☒ Other _Rent_ | ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)<br>☐ Wages, salaries, and compensation (fill out below)<br>Your SS #: _____<br>Unpaid compensation for services performed<br>from _____ to _____<br>(date) (date) |

**2. Date debt was incurred:**
May 01 to present

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ 1,011,818.00
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle
☐ Other_____
Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Priority Claim.**
☒ Check this box if you have an unsecured priority claim
Amount entitled to priority $ 230,635
Specify the priority of the claim: _Landlord_
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(4).
☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

**MAIL CLAIM TO:**

Clerk's Office
U.S. Bankruptcy Court
280 S First Street, #3035
San Jose, CA 95113-3099

| Date<br>12-10-02 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

 

# EXPLANATION OF CLAIM

The creditor is the landlord for the debtor. The claim is broken done into three time periods. A portion of it is an unsecured priority claim (administrative claim) and the other portions of it are unsecured.

(1)　Pre-bankruptcy unsecured claim for unpaid rent and related charges.
　　　May 1, 2001 through April 12, 2002
　　　Base rent in approximate amount of $334,497
　　　Parking lot rent in the approximate amount of $13,200
　　　Real estate taxes in approximate amount of $14,120
　　　Late charges from May 2001 to Feb. 2002 in approx. amount of $32,403

(2)　Administrative claim for rent during bankruptcy and while premises held property of the debtor
　　　April 12, 2002 through November 19, 2002 (Notice of Abandon)
　　　Unsecured priority claim
　　　Base rent in the approximate amount of $215,075
　　　Parking lot rent in the approximate amount of $8,400
　　　Real estate taxes in approximate amount of $7,060

(3)　Future damages or rent
　　　November 20, 2002 through November 20, 2003
　　　Damages or rent for one year (allowed under the Code)
　　　Base rent in the approximate amount of $368,700
　　　Parking lot rent in the approximate amount of $14,400
　　　Real estate taxes in approximate amount of $14,210

SUBTOTAL: $1,022,065
　　　　　 + $89,753　　　estimate of damages to premises & ads for new tenant
　　　　　 - $100,000　　　security deposit

TOTAL CLAIM: $1,011,818

| In re Digital Reflection, Inc. | Chapter 7 |
|---|---|
| Debtor | Case No.: 02-054152 MM |

## PROOF OF SERVICE

(United States Bankruptcy Court, Central District of California)

I am over the age of 18 years and not a party to the within action. I am employed at 610 Anacapa St., Suite B-3, Santa Barbara, CA 93101.

On **January 26, 2005,** I served the documents described as follows:

**Amended 1. Collateral Attack on State Court Judgment for Violation of Stay; 2. Complaint to Enforce Stay; 3. Request for Stay and Injunction; 4. Sanctions for Violation of Stay; 5. Determine Standing and Subject Matter Jurisdiction by Declaratory Relief.**

on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope, addressed as follows:

Office of the US Trustee
21051 Warner Center Lane, Suite 115
Woodland Hills, CA 91367

Trustee for Wayne Catlett
David Farmer
U S Trustee
P O Box 1443
San Luis Obispo, CA 93406

Attorneys for Robert P. Schiro, Sr.
Steven Pinsker, Esq.
Pinsker & Hurlbett
1316 Anacapa St.
Santa Barbara, CA 93101

Attorneys for Robert P. Schiro, Sr.
Steven A. Ellenberg, Esq.
Ruby & Schofield
125 South Market St., Suite 1001
San Jose, CA 95113-2285

Attorneys for Suzanne Decker, Trustee
Albert Flor, Esq.
Wendel, Rosen, Black & Dean
P.O. Box 2047
Oakland, CA 94604-2047

Trustee for Digital Reflection, Inc.
Suzanne L. Decker, Trustee
151 Callan Ave. #305
San Leandro, CA 94577

Joseph Kafka, Esq.
1541 The Alameda
San Jose, CA 95126

Brian Fittipaldi, Esq.
Office of the US Trustee
128 E. Carrillo Street
Santa Barbara, CA 93101

<u>Attorneys for the following individuals</u>
Christine H. Long, Esq.
BERLINER COHEN
10 Almaden Blvd. 11th Floor
San Jose, CA 95113-2233

| | |
|---|---|
| Anthony Thomas | Eli F. Thomas |
| Eli John Thomas | Dorothy Thomas |
| Frances Thomas | Jim Thomas |
| Jim Stump | Michelle Thomas |
| Ely F. Thomas | Greg P. Tabish |
| Chris Thomas | Anthony McCarthy |
| Frank Tabish | Pat McCarthy |
| John McCarthy | Anthony J. & Lee Ann McCarthy Trust |

I caused such envelopes to be deposited in the mail at Santa Barbara, California. The envelopes were mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Santa Barbara, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **January 26, 2005**, at Santa Barbara, California.

_____
Emi Yamada